CUNITED STATES DISTRICT COURT EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| THOMAS J. MURRER, individually and on behalf of all others similarly situated, | Case No.  3:24-cv-49 |
| *Plaintiff*, | **COMPLAINT - CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| WELLS FARGO BANK, N.A., | |
| *Defendant*. | |

Plaintiff Thomas J. Murrer ("Murrer" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through his counsel, brings this Class Action Complaint ("Complaint") against Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"), and based upon personal knowledge with respect to himself, and on information and belief and the investigation of counsel as to all other matters, in support thereof alleges as follows:

## NATURE OF THE ACTION

1.  Plaintiff brings this action individually and on behalf of a class of all similarly situated customers or consumers[1] (collectively "Customers" or "Class members") against Defendant Wells Fargo arising from its fraudulent, deceptive, and unfair business practices in the marketplace. Wells Fargo has documented its failure to implement and follow commercial reasonable security procedures required to protect its Class members' data, identity, and assets. Specifically, from January 2020 through present, in violation of its various Class members Agreements and statutory

---

[1] Under the Privacy of Consumer Financial Information Rule of the Gramm-Leach-Bliley Act, a "consumer" is someone who obtains or has obtained a financial product or service from a financial institution that is to be used primarily for personal, family, or household purposes, or that person's legal representative. The term "consumer" does not apply to commercial clients, like sole proprietorships.

requirements, Wells Fargo's operational controls, investigation processes and remediation protocol fail to identify, detect, protect, mitigate and remediate fraudulent financial transactions causing financial harm to its Class members, allowing wrongful disclosure of Class members 'nonpublic personal information' ("NPI"),[2] failing to properly notify, remediate, or reimburse its affected Class members[3] and knowingly reporting false and fraudulent information about its Class members' financial information to the credit reporting agencies.

2.    Defendant falsely and deceptively misrepresents its practices, including those in its **Wells Fargo Deposit Account Agreement** contract, which consists of the Terms and Conditions for its Class members, attached hereto as Exhibit A ("Deposit Agreement"); and its Class members **Wells Fargo Credit Card Customer Agreement** hereto as Exhibit B ("Card Agreement").

3.    **Wells Fargo Deposit Agreement** provides in relevant part:

> *"Zero Liability Protection - With Zero Liability protection, you'll have zero liability for any card transactions that you did not make or authorize...For card transactions from consumer accounts: your card comes with Wells Fargo's Zero Liability protection, which provides you with more coverage than what Regulation E requires for cards accessing consumer accounts...sending or receiving transfers between you accounts...would be covered by Regulation E."*

4.    **Wells Fargo Card Agreement** provides in relevant part:

> *"Liability for unauthorized use – [Wells Fargo] will not hold you liable for the unauthorized use of Account…"*

5.    Numerous documented failures in the Wells Fargo's statutorily required internal control environment, investigation processes, and remediation protocols allows unknown and unauthorized

---

[2] NPI is any "personally identifiable financial information" that a financial institution collects about an individual in connection with providing a financial product or service.

[3] The Federal Financial Institutions Examination Council (FFIEC) is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation (FDIC), the National Credit Union Administration (NCUA), the Office of the Comptroller of the Currency (OCC), and the Consumer Financial Protection Bureau (CFPB), and to make recommendations to promote uniformity in the supervision of financial institutions.

individuals to fraudulently gain access to its Class members' banking and credit card accounts, conduct various unauthorized transactions over extended periods of time, absconding vast sums of Customer funds, before Wells Fargo takes any action in response to the industry standard fraud indicators and statutory requirements to protect the Class members' assets and NPI.

6. Contrary to its contractual and statutory requirements, Wells Fargo refuses to remediate fraudulent transactions and refuses to properly reimburse its Class members for the fraudulent losses its Class members sustained as a result.

7. This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

8. As described herein, Defendant's practices violate Virginia common law, as well as the Defendant's own form contracts.

9. Defendant's improper scheme to allow fraudsters to extract and retain funds from its Class members, and from which Wells Fargo, contrary to its contractual and statutory requirements, pushes the liability for its fraudulent losses to its Class members. Defendant then charges the Class members transaction fees and interest on the known fraudulent transactions, victimizing Plaintiff and hundreds of other similarly situated Class members. Unless enjoined, Defendant will continue to engage in these schemes and will continue to cause substantial injury to its Class members.

10. Wells Fargo's conduct caused its Class members to lose or be charged millions of dollars through its scheme to improperly transfer liability for its fraudulent losses, then wrongfully charge fees and interest in the aggregate since January 2020, benefiting Wells Fargo at the expense of its Class members.

11. Wells Fargo was financially motivated to breach the covenant of good faith and fair dealing and to make materially false and misleading statements with respect to its Deposit Agreements and Card Agreements. Wells Fargo was able to report higher profits by not implementing the proper

internal fraud controls, not identifying or remediating the fraudulent transactions, then improperly transfer liability for its fraudulent losses and then charging its Class members the fees and interest for those fraudulent transactions.

12. Despite having to pay more than $8.6 billion dollars[4] in fines, penalties and settlements since 2017 for its fraudulent practices, Wells Fargo continues to ignore its statutory and contractual obligations to its Class members.

## THE PARTIES

13. Plaintiff is a natural "person" and "consumer" as defined by 15 USC §1681a (b) and (c), a citizen of the United States domiciled in the Commonwealth of Virginia, and has been a Wells Fargo banking and credit card Customer since 2014.

14. Defendant Wells Fargo Bank, National Association ("Wells Fargo" or "Defendant"), a wholly-owned subsidiary of Wells Fargo Financial Corporation, is the 4th largest United States commercial bank and a provider of banking, mortgage, investing, credit card, insurance, and consumer and commercial financial services doing business throughout the United States and Virginia, and is a "financial institution" as defined by 15 USC §1681t.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative Class exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed Class that is comprised of over one hundred (100) members, and because at least one of the members of the proposed Class is a citizen of a different state than Wells Fargo.

16. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) because Wells Fargo has

---

[4] $13.2 billion dollars in fines, penalties and settlements for all Wells Fargo entities:
https://violationtracker.goodjobsfirst.org/?parent=wells-fargo&order=pen_year&sort= Accessed 01/18/24

a presence in this District. Venue is further proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred and continue to occur in this District.

## FACTUAL ALLEGATIONS

### I. Wells Fargo's false and misleading representations to its Class members

#### A. Wells Fargo's Deposit Agreement

17. On or about October 1, 2014, Plaintiff opened his personal checking account and continues his primary banking transactions at a Wells Fargo branch in Henrico County, Virginia pursuant to Wells Fargo's Deposit Agreement as periodically amended, that provides in relevant part:

*"Wells Fargo*

    a. *will follow commercial reasonable security procedures [of their choice] to verify the authenticity of an instruction to send a funds transfer from your account;* and

    b. *If we do not complete a transfer or from your account...in the correct amount according to our agreement with you, [Wells Fargo] will be liable for your losses or damages;* and

    c. *determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly...we may take up to 45 days to investigate your complaint ...if we need more time, we will credit your account within 10 business days for the amount you think is in error;* and

    d. *Zero Liability Protection – With Zero Liability Protection, you'll have no liability for card transactions that you did not make or authorize...so long as those transactions occurred before the end of the 60-day period described [after the statement was mailed or otherwise available to you;* and

    e. *Indemnities applicable to electronically created items – if [Wells Fargo] transfer[s] or present[s] an 'electronically create item'... we're required to indemnify and reimburse each transferee bank, any subsequent collecting bank, the paying bank, and any subsequent returning bank against losses result from the fact that: 'the person on whose account the electronically created item is drawn didn't authorize its issuance or the payee stated on the item."*

### B. Wells Fargo's Card Agreement

18. On or about March 25, 2021, Plaintiff opened his Wells Fargo VISA credit card account, pursuant to the Card Agreement, which holds in relevant part:

      a.   *"Liability for unauthorized use – [Wells Fargo] will not hold you liable for the unauthorized use of [the Wells Fargo VISA credit card] subject to [card holder] must notify [Wells Fargo] immediately if you suspect or know that the [VISA card] is [being used] by an unauthorized person…"*

### C. Wells Fargo's Artificial Intelligence System

19. On August 19, 2020, Wells Fargo announced to its Class members and to the general public[5] ***"When customers [Class members] contact Wells Fargo, AI [Artificial Intelligence] System goes to Work,"*** stating in part:

*"It has built a system it calls Advanced Listening that lets customers [Class members] communicate through the channel of their choice — phone call, email, text, survey response, online banking interaction — **and listens to or analyzes every interaction**. The **system uses artificial intelligence** to understand what customers [Class members] are saying, **identify problems or needs, root out widespread issues**…It detects potential compliance violations or systemic issues.*

*Wells Fargo is a company that has been trying to repair its relationship with customers [Class members]. For about 14 years, starting in 2002, employees in the community bank division were pressured through aggressive sales goals into opening millions of unauthorized accounts and issuing millions of unauthorized cards, according to the Office of the Comptroller of the Currency.*

*The bogus accounts were uncovered by the Los Angeles Times in 2013 after it received dozens of complaints from Wells Fargo Class members. The aftermath included government probes, $185 million in penalties in 2016 and a federal cap on assets that is still in place. Some Class members must have complained to the bank first**. If [Wells Fargo] had the ability to feed all customer [Class member] communications into one AI engine, perhaps it might have caught and addressed the problem.***

*As customer [Class members] conversations take place, Advanced Listening monitors both the conversation and what the [Wells Fargo] team member does during that conversation. It tries to understand and categorize the gist of every interaction. Then algorithmic models look for changes and emerging trends…We're able to categorize and analyze the interactions and even automate*

---

[5] https://www.americanbanker.com/news/when-customers-contact-wells-fargo-ai-system-goes-to-work Accessed 12/26/23.

*aspects of our complaint management process…Another use case for Advanced Listening is **to listen to phone calls to make sure certain compliance activities are performed during the phone call.** (Emphasis supplied.)"*

20. On November 7, 2022 at 9:24 a.m., Wells Fargo's internal access control systems detected a suspicious and previously reported "highly suspicious" Internet Protocol ("IP") address[6] and new device making multiple attempts to access the Plaintiff's banking and credit card accounts. Wells Fargo relied on ineffective email and Short Message/Messaging Service ("SMS") one-time passcodes ("OTP") to authenticate the suspicious devices. The financial services industry, and its regulators are aware that email and SMS based OTP are not commercially reasonable security procedures as they are ineffective and can easily be defeated with simple social engineering[7] wherein the fraudster impersonates a representative of the bank.[8]

21. Based on the documents and recordings provided by Wells Fargo, on November 7, 2022, Wells Fargo ignored multiple commercially reasonable indications of potential fraud that Wells Fargo identified, i.e., the suspicious online activity from an unknown device using a reported "highly suspicious" IP address. Without contacting the Plaintiff directly, Wells Fargo permitted online transactions changing Plaintiff's username and password on all of his banking and credit card accounts, enrollment in online wire services, addition of new beneficiaries, cash advances on previously dormant credit card accounts, immediately followed by online wires to the fraudster's

---

[6] https://multirbl.valli.org/lookup/172.58.189.250.html  and https://multirbl.valli.org/lookup/172.58.251.143.html  Accessed 12/20/23.

[7] In information security settings, social engineering is the psychological manipulation of people into performing actions or divulging confidential information - A confidence trick for the purpose of information gathering, fraud, or system access. Different that the traditional "con," social engineering is more complex and is described as 'any act that influences a person to take an action that may or may not be in their best interests.'

[8] The FFEIC Guidance on Authentication and Access to Financial Institution Services and Systems explicitly states:
*"…certain authentication controls, previously shown effective, no longer provide sufficient defense against evolving and increasingly sophisticated methods of attack. In particular, malicious activity resulting in a compromise of customer and user accounts and information system security has shown that single-factor authentication, either alone or in combination with layered security, is inadequate in many situations."*
Gramm-Leach-Bliley Act also states that financial institution safeguards **must** *"…protect against **any anticipated threats or hazards**…"*

JPMorgan Chase account. These are not commercially reasonable industry security procedures.

22. Commercially reasonable industry security practice requires these identified suspicious activities to be flagged, the accounts restricted and enrollment in the online wire service prevented until the customer could be authenticated in a branch, however Wells Fargo did none of these practices.

23. On November 7, 2022 at 12:57 P.M., in violation of the Deposit Agreement and the Card Agreement, Wells Fargo permitted a fraudulent debit card ending in 5101 to be activated from a fraudulent online transaction.

24. On November 7, 2022 and November 8, 2022, Wells Fargo permitted fraudulent withdrawals and charges of $11,188.64 to Plaintiff's VISA 8650.

25. On November 7, 2022 at 12:58 P.M., in violation of the Deposit Agreement and the Card Agreement, Wells Fargo permitted fraudulent changes to the statement delivery preferences for Plaintiff's Checking 9340 from a fraudulent online transaction.

26. Notwithstanding the confirmed fraud, on November 7, 2022 between 1:30 P.M. and 1:33 P.M., in violation of the Deposit Agreement and the Card Agreement and contrary to commercially reasonable industry security practices, Wells Fargo permitted fraudulent transfers and/or wire transactions of $9,000, $1,500 and $1,600.00 from Plaintiff's accounts, including $450.00 in fraudulent transaction fees.

27. On November 7, 2022 and November 8, 2022, Wells Fargo permitted fraudulent cash advances to be wired into Plaintiff's bank accounts from Plaintiff's credit card accounts, then fraudulently wired from to Plaintiff's single member LLC, Tall Weeds, LLC's Checking 9743 to fraudster's "Whitney Desulme's" account at JPMorgan Chase in two separate wires, one for $9,109.67 and one for $14,323.30. See Wells Fargo's reference numbers WTFed#01126, TRN22110711966 and WTFed#02233, TRN221107121962 respectively.

28. On November 7 and 8, 2022, with actual knowledge of the potential fraud indicators: Wells Fargo facilitated multiple fraudulent credit card cash advances and fraudulent wire transactions – all well above the Plaintiff's year-to-date average daily balance, from Plaintiff's accounts. Plaintiff had never taken cash advances from his credit card accounts, nor sent wires from his bank accounts.

29. Based on the documents and recordings provided by Wells Fargo, Wells Fargo noted that while it facilitated multiple fraudulent transactions on Plaintiff's banking and credit card accounts, its employee made "no call [directly] to the [Plaintiff] due to the [Plaintiff's] carrier was T-MobileMetro PCS." Wells Fargo has never disclosed to Plaintiff or its Class members that those with TMobile telephone accounts will not be contacted directly when Wells Fargo suspects fraudulent activity on the Class members' accounts.

30. Commercially reasonable industry practice, given all of these known fraud indicators, is to restrict the ability to send wires for 7-10 days to give the financial institution, and its Class members time to verify the identity of the unauthorized access; send notification to the Class members that their password was recently changed, and for the Class member to contact the bank if this change was unauthorized.

31. Based on the recorded calls provided by Wells Fargo, the fraudster was able to repeatedly socially engineer Wells Fargo employees who then failed to identify numerous indications of the fraudster's account take-over of Plaintiff's accounts and abscond with Plaintiff's assets.

32. Based on the documents and recordings provided by Wells Fargo, Wells Fargo accepted the fraudster's inbound telephone calls that originated from an Automatic number identification ("ANI")[9] that was never previously associated with the Plaintiff's account. Wells Fargo subsequently

---

[9] Automatic number identification ("ANI") is a feature of a telecommunications network for automatically determining the origination telephone number. This is a frequently used suspicious activity indicator flag.

labeled these calls as coming from a "Customer Impersonator."[10]

33. Commercially reasonable industry practice is to engage technology to detect inbound calls from unknown or suspicious phone numbers and notify Wells Fargo's fraud prevention employees that the call is originating from a risky phone number. Behaviors associated with social engineering of account takeover fraud schemes include: urgent demands, threats, requests for exceptions to existing policies and procedures, refusal to follow existing processes, and inconsistent explanations. All of these were present in the multiple calls made to Wells Fargo by the "customer impersonator," yet Wells Fargo enabled the fraudulent cash advances and multiple fraudulent wires from Plaintiff's accounts to occur, in violation of its Deposit Agreements, Reg. E and Uniform Commercial Code Article 4A, §201.

34. Commercially reasonable industry security practices for wire transactions must allow sufficient time for the Customer to identify and respond to the unauthorized access and known fraud indicators before allowing high-risk wire transactions to be processed. Wells Fargo's practices do not.

35. On November 7, 2022 at 10:14 a.m., Wells Fargo's fraud case management notes related to the first fraudulent wire made from Plaintiff's account, indicate the funds were being sent because the "customer's wife…was stuck in Spain to buy plane tickets."

36. On November 7, 2022 at 10:55 a.m., Wells Fargo's fraud case management notes related to the second fraudulent wire made from Plaintiff's account, indicate the funds were being sent to

---

[10] Wells Fargo employees failed to identify other common behaviors that fraudsters use to gain unauthorized access to Customers' accounts. In the "NICE" Customer recordings [NICE inContact Call Recording software used by most banking call centers] provided by Wells Fargo, the "Customer Impersonator a/k/a fraudster" says he is unwilling to accept a call back from the bank, which is commercially industry well-known red flag. The call recording designated by Wells Fargo "TW-MURRER-WELLS FARGO-000515.wav", the fraudster tells Wells Fargo, "it will take me moment to get that," referring to the OTP code that had been sent. Then the fraudster failed the OTP challenge, but was immediately sent another code to try again. On the call recording titled "TW-MURRER-WELLS FARGO-000522.wav", the fraudster demands to speak with a supervisor and refuses to accept an inbound call, which is a common indication of account take-over fraud.

"the wife to get new lawn mower equipment." In addition to having access to the first set of notes entered at 10:14 a.m., Wells Fargo employees had access to Plaintiff's entire banking and credit card record showing there were no other joint owners or authorized users on any of the accounts – ever.

37. On November 8, 2022, on the Wells Fargo recorded customer telephone call titled "TW-MURRER-WELLS FARGO-000515.wav," the fraudster tells the Wells Fargo employee "he has sent wires to this beneficiary before" despite the Plaintiff's accounts showing there were no wires ever sent from any of his accounts in the eight (8) years he was a customer.

38. Commercially reasonable industry practice requires fraud prevention programs to, *inter alia*:

    a. direct employees to review the notes related to previous fraud alerts, identify all inconsistencies or suspicious activity, and.

    b. review the source of money used to fund the wires to identify the suspicious activity indicators and money movement used by fraudsters; recent transfers from other internal and external accounts are a common industry known red flag for account takeover frauds.

39. Based on the documents and recordings provided by Wells Fargo, its internal controls rely heavily on ineffective and outdated SMS and email One-time Passcodes despite its advertising to its Class members that it employed state-of-the-art AI technology[11].

40. Based on the documents and recordings provided by Wells Fargo, its controls were unable to detect and prevent **this same fraudster** from attacking other Wells Fargo Class members, **months after perpetrating** the fraud against Plaintiff. The call recording titled "TW-MURRER-WELLS FARGO-000523.wav," does not involve Plaintiff's accounts and discloses another Wells Fargo Customer's name, home address, bank account number and social security number.

41. On the 00523.wav call, which took place in January 2023, the same fraudster who called

---

[11] See ¶20 and fn. 4, *supra*.

Wells Fargo impersonating Plaintiff, called Wells Fargo **from the same ANI - telephone number** (515-300-4329) he used in November 2022 to perpetrate the fraud on Plaintiff, **and perpetrated the same fraud on yet another Wells Fargo customer.**

42. Commercially reasonable industry practices would be for Wells Fargo to document the known "customer impersonator" ANI information and add that to its high risk/no call list, either blocking that number, or route it directly to properly trained Wells Fargo fraud prevention employees. Wells Fargo did neither.

43. Based on the documents and recordings provided by Wells Fargo, on November 15, 2022, Wells Fargo's fraud prevention investigator noted in Plaintiff's account that "*This is a known scam in which the caller will try to elicit funds from the customer through a device compromise… Customer is the victim of a Wells Fargo Employee Impersonator Scam,*" evidencing Defendant is well aware that email and SMS OTP are easily defeated using bank impersonation scams.

44. On November 7, 2022 at 11:20 a.m. Plaintiff received a telephone call from 800-723-5523 – the Wells Fargo Fraud Department telephone number listed on Wells Fargo's website; the caller identified herself as working for Wells Fargo's Fraud Department. Unbeknownst to Plaintiff, the caller was a fraudster impersonating a Wells Fargo employee.

45. The Consumer Financial Protection Bureau's ("CFPB") guidance[12] to financial institutions is unequivocal: financial institutions may not consider a consumer's negligence when determining liability for unauthorized Electronic Funds Transfers ("EFT" or "Wire") under Regulation E. The CFPB expressly states that negligence by the consumer cannot be used as the basis for imposing greater liability than is permissible under Regulation E-12 CFR 1005.6; Comment 6(b)-2.

46. On November 14, 2022, Plaintiff went to the local Wells Fargo Branch, confirmed that he did not authorize the fraudulent transactions and opened new banking and credit card accounts.

---

[12] See Electronic Fund Transfers FAQs (consumerfinance.gov) Accessed 12/22/23.

47. On November 27, 2022, Wells Fargo notified Plaintiff of suspected fraudulent activity on debit card ending in 0083, with debit card transactions occurring in Tempe, AZ when Plaintiff had never left the Richmond, VA area.

48. Contrary to CFPB's express guidance,[13] Wells Fargo instructed the Plaintiff to file a police report identifying the financial fraud, which he did on December 19, 2022. (City of Richmond Police Report #2022-12190441).

49. On December 21, 2022, January 11, 2023, and January 19, 2023, Wells Fargo notified Plaintiff of suspected fraudulent activity on his debit card ending in 0083.

50. Wells Fargo, after identifying and confirming the fraudulent transactions on Plaintiff's accounts no later than December 2022, refuses to refund the money it permitted the fraudsters to steal from his bank accounts, has not credited his credit cards for the fraudulent cash advances it facilitated and as of the date of this pleading Wells Fargo is continuing to charge Plaintiff interest, penalties and fees on the fraudulent transactions.

51. Since November 2022, Wells Fargo is knowingly filing false information regarding Plaintiff's account with each of the credit bureaus, damaging his credit rating, and preventing him from getting other lines of credit.

52. As a result of Wells Fargo's breach, Plaintiff's only credit card, with a credit limit of $10,500.00 carried a fraudulent balance of over $9,688.64 forcing Plaintiff to make monthly payments, so as not to further damage his credit rating, and incur interest and fees to date in the amount of approximately $3,700.00.

---

[13] *Id*., at pg. 9 - QUESTION 4: Can a financial institution require a consumer to file a police report or other documentation as a condition of initiating an error resolution investigation? *No*. A financial institution must begin its investigation promptly upon receipt of an oral or written notice of error and may not delay initiating or completing an investigation pending receipt of information from the consumer. See Comments 11(b)(1)-2 and 11(c)-2. In the past, Bureau examiners found that one or more financial institutions failed to initiate and complete reasonable error resolution investigations pending the receipt of additional information required by the institution. These examples can be found in the Bureau's Summer 2020 edition of Supervisory Highlights and Fall 2014 edition of Supervisory Highlights. The Bureau cited similar violations in 2019-BCFP-0001.

53. As a result of Wells Fargo's breach, Plaintiff's was not able to access his rightfully earned credit limit and his credit rating was negatively impacted causing Plaintiff to have to borrow $10,000.00 to meet his monthly living expenses.

54. Wells Fargo's conduct has been widely panned as dishonest and unfair. Complaints from consumers regarding Wells Fargo's practices abound on the Internet, and even savvy Class Members who follow and post on personal finance blogs are surprised by Wells Fargo's tolerance for and mishandling of fraudulent transactions. The following are illustrative and not an exhaustive recounting of the many online complaints about Wells Fargo for the conduct alleged herein:

a. "Wells Fargo bankers tell customer they're too busy to stop wire scam." https://www.youtube.com/watch?v=-a-vkrB05Xc

b. https://www.the-sun.com/news/10115570/wells-fargo-bank-account-wiped-thousands-san-diego/

c. https://dailyhodl.com/2024/01/20/wells-fargo-refuses-to-reimburse-customers-after-mysterious-withdrawals-discovered-heres-why-the-bank-wont-budge/

d. https://www.the-sun.com/news/9934686/wells-fargo-customer-had-savings-vanish-after-phone-call/

e. While Wells Fargo ultimately issued a refund to the Class Member, the Class member stated: "*I don't have confidence in the bank that our current checking and savings accounts would be safe from further fraud.*" https://abc7chicago.com/wells-fargo-fraudulent-account-scam-drained-life-savings/12607642/ Wells Fargo then issued this knowingly false statement to the press:

"*After conducting our review, we're pleased to resolve this matter for our customer. We are sorry for the inconvenience and worry our customer encountered as we know situations like these can weigh heavily on those impacted. **We have a very extensive fraud program dedicated to protecting our customers and a thorough investigation process to research all reports of account fraud and identity theft. <u>When we confirm fraud on an account, we take action to block the fraudulent activity and reimburse the fraud victim</u>**.*" *(Emphasis supplied.)*

f. https://www.tiktok.com/@caffeineandgrace/video/7324523784961084702

g. https://www.reddit.com/r/personalfinance/comments/11ptabu/wells_fargo_denied_my_17450_fraud_claim_what_can/

## CLASS ALLEGATIONS

55. This action is brought by Plaintiff, for himself and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff seeks to represent a class of all persons who maintained a Wells Fargo deposit account or credit card account at any time from January 2020 through the present (the "Class"), with the exact date to be determined through discovery. Plaintiff also seeks to represent a subclass of all persons in Virginia who maintained a Wells Fargo account at any time from January 2020 through the present (the "Virginia Subclass"), with the exact date to be determined through discovery.

56. Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a Subclass(es) if necessary, before this Court determines whether certification is appropriate.

57. Excluded from the Class are Wells Fargo and any person, firm, trust, corporation, or other entity related to or affiliated with any of Wells Fargo's partners, subsidiaries, affiliates or joint ventures.

58. The members of the Class are so numerous and dispersed that it would be impracticable to join them individually. At all relevant times, there were thousands of affected Wells Fargo accountholders. The precise number of Class members and their identities are unknown to Plaintiff at this time but can be determined through discovery.

59. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to Class and/or Virginia Subclass are:

a. The depth and scope of Wells Fargo's operational internal control failures amongst its accountholders in its handling of its statutorily and contractually required security procedures necessary to protect its Class members' data, identity, and assets was conducted dishonestly, unfairly, and/or in bad faith;

b.  Whether Wells Fargo breached the covenant of good faith and fair dealing implied by law into its contracts with its Class members;

c.  Whether Wells Fargo's conduct violated the Virginia Unfair Trade Practices and Consumer Protection Law;

d.  Whether Wells Fargo's conduct violates principles of quasi-contract and caused Wells Fargo to be unjustly enriched; Whether Wells Fargo's conduct violates principles of promissory estoppel;

e.  Whether Wells Fargo's wrongful conduct caused Plaintiff and the Class members damages;

f.  The number of damages suffered by Plaintiff and Class members;

g.  The amount of restitution to which Plaintiff and Class members are entitled;

h.  Whether Plaintiff and Virginia Subclass members are entitled to treble and/or punitive damages;

i.  Whether Plaintiff and Class members are entitled to a statutory award of reasonable award of attorneys' fees, interest, expenses and costs of suit.

60. Plaintiff's claims are typical of the claims of the members of the Class he seeks to represent because they were all Wells Fargo accountholders.

61. Plaintiff will fairly and adequately represent and protect the interests of the Class and has no interests that conflict with or are antagonistic to the interests of Class members. Plaintiff has retained attorneys who are experienced and capable of prosecuting class actions and complex litigation. Plaintiff's attorneys will actively conduct and be responsible for prosecuting this litigation, and have adequate resources, experience, and commitment to litigate this matter.

62. A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual Class members to bring a separate action. Since the damages suffered by individual

Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

63. Defendant, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

64. Class certification is also appropriate because there is a readily identifiable class on whose behalf this action can be prosecuted.  Class members are readily ascertainable from Wells Fargo's records.  A notice of pendency or resolution of this class action can be provided to Class members by direct mail, email, publication notice, or other similar means.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT AND BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of the Plaintiff and the Class)

65. Plaintiff re-alleges and incorporates all other factual allegations set forth in paragraphs 1 through 64 in this Complaint.

66. Plaintiff and Defendant have contracted for banking and credit card services, as embodied in Defendant's Deposit Agreement and Card Agreement (collectively "contracts" or "agreements").

67. All Defendant's contracts entered into by Plaintiff and the Class are identical or substantively identical because Defendant's form contracts were used uniformly.

68. Defendant has repeatedly breached the express terms of its own contracts as described herein.

69. Under Virginia law, good faith is an element of every contract between banks and their Class members because banks are inherently in a superior position to their Class members and, from this superior vantage point, they offer Class members contracts of adhesion, often with terms not readily discernible to a layperson.

70. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

71. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain and abuse of a power to specify terms.

72. Defendant failed to abide by its obligations imposed by law when it ignored commercially reasonable industry security fraud indices, then failed to stop and in fact facilitated fraudulent account activity, transferred its liability to its Class members, and took no remedial measures as to its victims.

73. Defendant failed to abide by its statutory and contractual duties to reimburse its Class members for the fraudulent account activity it facilitated and, in some cases, charged the Class members fees and interest on the fraudulent activity.

74. In these and other ways, to be proven at trial, Defendant violated its duty of good faith and fair dealing.

75. Defendant knowingly and willfully engaged in the foregoing conduct for the purposes of (1) gaining unwarranted contractual and legal advantages; and (2) maximizing fee revenue from

Plaintiff and other members of the Class.

76. Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the agreements.

77. Defendant's breach damaged, and continues to damage Plaintiff and members of the putative Class. Wells Fargo, in breach of its Deposit Agreement and Card Agreement, has failed to follow commercially reasonable industry security procedures to protect Plaintiff's assets, failed to comply with its statutorily required responsibilities to protect Plaintiff's and the Class members' assets, and has refused to return the entire amount of funds wrongfully absconded from Plaintiff and the Class, charging Plaintiff and the Class fees and interest on the amounts wrongfully absconded.

## COUNT II – CONVERSION
### (On Behalf of the Plaintiff and the Class)

78. Plaintiff re-alleges and incorporates all factual allegations set forth in paragraphs 1 through 64 in this Complaint.

79. Plaintiff has spent over fourteen (14) months dealing with various Wells Fargo staff members in his attempt to recover the funds that Wells Fargo's breach caused to be fraudulently absconded, as the documents and recordings provided by Wells Fargo evidence. Plaintiff has been repeatedly given knowingly false and misleading information by Wells Fargo.

80. Despite being in breach of the Deposit Agreement and the Card Agreement, Wells Fargo, continues to knowingly, intentionally and wrongfully assert dominion and control over and withhold Plaintiff's and Class members' funds and knowingly damage Plaintiff's and Class members' credit scores and access to credit.

## COUNT III
## BREACH OF QUASI-CONTRACT AND UNJUST ENRICHMENT
### (On Behalf of the Plaintiff and the Class)

81. Plaintiff re-alleges and incorporates all factual allegations set forth in paragraphs 1 through

64 in this Complaint.

82. Plaintiff brings this claim in the alternative to the claim in Counts I and II, in the event the Court determines that Plaintiff (and member of the Class), on the one hand, and Defendant, on the other hand, were not subject to a contractual relationship.

83. Plaintiff and the Class conferred a benefit on Wells Fargo by maintaining their cash in the various deposit accounts, and accessing Wells Fargo's various credit card offerings. Defendant knowingly transferred its fraud liability to Plaintiff and unjustly profited from the fees and interest rate charges to Plaintiff and the Class.

84. In the absence of a contract, Plaintiff and the Class have no adequate remedy at law.

85. Defendant's unjust enrichment can be remedied by ordering Defendant to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from Plaintiff and the Class as a result of the unlawful and/or inequitable conduct described herein.

## COUNT IV
## VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT,
### Va. Code §59.1-196, *et seq.*
### (On Behalf of the Plaintiff and Virginia Sub-Class)

86. Plaintiff re-alleges and incorporates all factual allegations set forth in paragraph 1 through 64 in this Complaint.

87. As described above, while engaging in trade or commerce within the Commonwealth of Virginia during the time period relevant hereto, Wells Fargo:

    a.    Advertised its superior AI capabilities, and its

> *"Security - We help protect your financial information…24/7 fraud monitoring means we regularly review accounts for unusual activity…You are not responsible for unauthorized card transactions when you report them promptly."[14]*

---

[14] https://www.wellsfargo.com/goals-banking-made-easy/why-wells-fargo/ Accessed 12/22/23.

b.    Unfairly and deceptively assuring Class members of its Fraud Monitoring capabilities:

*"24/7 Fraud Monitoring*

**We help keep your money safe by monitoring your accounts and may contact you if we detect unusual activity."**[15]

c.    Misrepresents its fraud detection capabilities as being state-of-the-art when they are neither commercially reasonable industry security procedures nor in compliance with its contractual or statutory requirements.

88. Wells Fargo fails to disclose to its Class members that its fraud department will not contact Class members directly if the Customer has a TMobile account.

89. The aforesaid methods, acts, and practices constitute unfair methods of competition and unfair acts or practices in the conduct of trade or commerce prohibited by Va. Code §59.1-196, *et seq*. including, but not limited to, the following:

a.    "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have";

b.    "representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another";

c.    "advertising goods or services with intent not to sell them as advertised"; and

d.    "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."

90. To the extent reliance is an element of any of the claims under the Virginia statute, Plaintiff and Class members are presumed to have relied on Defendant's conduct.  No rational person would maintain its assets with Wells Fargo given Defendant's knowing and willful noncompliance with its

---

[15] *Id.*

contractual and statutory requirements.

91. The aforesaid acts damaged Plaintiff and members of the putative Virginia Subclass.

92. Plaintiff and the putative Virginia Subclass are entitled to treble and/or punitive damages pursuant to Va. Code §59.1-206.

**COUNT V**
**PROMISSORY ESTOPPEL**
**(On Behalf of the Virginia Sub-Class)**

93. Plaintiff re-alleges and incorporates all factual allegations set forth in paragraph 1 through 64 in this Complaint.

94. Plaintiff brings this claim in the alternative to the claim in Count I, in the event the Court determines that Plaintiff (and member of the Virginia Subclass), on the one hand, and Defendant, on the other hand, were not subject to a contractual relationship with respect to the Deposit Accounts.

95. Defendant promised that its 24/7 fraud monitoring capabilities were designed to induce Class members to deposit their assets with Wells Fargo.

96. In reliance on Defendant's statements as alleged herein, Plaintiff (and Virginia Subclass members) took action by depositing their funds in Wells Fargo accounts, and refrained from taking action by leaving their funds in Wells Fargo accounts.

97. Class members are presumed to have relied on Defendant's conduct.  No rational person would maintain its assets with Wells Fargo given Defendant's knowingly and willful noncompliance with its contractual and statutory requirements.

98. Injustice can be avoided only by enforcing Defendant's promise and statutory obligations.

**COUNT VI**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT (FCRA), 15 U.S.C. §1681 *et seq*.**
**(On Behalf of the Plaintiff and the Class)**

99. Plaintiff re-alleges and incorporates all factual allegations set forth in paragraph 1 through 64 of this Complaint.

100.   Defendant has knowingly and willfully violated the provisions of the FCRA by repeatedly failing to comply with its obligations as a financial institution pursuant to 15 U.S.C. §1681t. Defendant's breach, failure to comply with its statutory requirements and its scheme to transfer its fraud liability and charging fees and interest to its Class members has damaged, and continues to damage Plaintiff and members of the putative Class.

101.   As a result of Wells Fargo's breach, failure to comply with its statutory requirements and its scheme transferring its fraud liability, Wells Fargo knowingly and willfully reports inaccurate information to the credit bureaus on its affected Class members, in violation of 15 U.S.C. §1681 *et seq*.

102.   Injustice can be avoided only by enforcing Defendant's promised contractual and statutory obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

a.   Certify this case as a class action, designating Plaintiff as class representative and designating the undersigned as Class Counsel; and

b.   Award Plaintiff and the Class actual damages in any amount according to proof; and

c.   Award Plaintiff and the Class restitution in an amount to be proven at trial; and

d.   Award Plaintiff and the Class pre-judgment interest in the amount permitted by law; and

e.   Award Plaintiff and the Class statutory damages, attorneys' fees, costs and expenses as permitted by law; and

f.   Declare Defendant's practices outlined herein to be unlawful to the extent they are inconsistent with the Contract and the law; and

g.   Enjoin Defendant from engaging in the practices outlined herein to the extent they are

inconsistent with the Contract; and

h.  Grant Plaintiff and the Class a trial by jury; and

i.  Grant leave to amend these pleadings to conform to evidence produced at trial; and

j.  Grant such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff and the Class members demand a trial by jury on all triable issues.

Respectfully Submitted,

By:  __/s/_____

MR. RICHARD J. KNAPP, ESQ. (VSB #15834)
**RICHARD J. KNAPP & ASSOCIATES P.C.**
1910 Byrd Avenue, Suite 5
Richmond, Virginia 23230
Telephone: 804-377-8848, ext. 4#
Facsimile: 804-377-8851
Richard@rknappesq.com
*Local Counsel for the Plaintiff and the Putative Class*

MR. JOHN A. YANCHUNIS, ESQ.
(*Pro Hac Vice application forthcoming*)
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-4736
jyanchunis@ForThePeople.com
*Attorney for the Plaintiff and the Putative Class*